We have five cases on the calendar this morning, four patent cases to be argued, two from the PTO, two from district courts, and one military pay case from the Court of Federal Claims that has been submitted in the brief and will not be argued. The first case is HealthTrio v. Aetna et al. 2016-1034. Mr. Jacobs, good morning. Good morning. May it please the Court. The district court in this case made several errors when it dismissed HealthTrio's case on the pleadings. Fundamentally, it ignored its own claim construction and defined the invention at too high a level of generality, ignoring the claims and what it actually said the invention was. The court also declined to consider HealthTrio's creative insight, which it called it, at either the first or the second steps of Mayo. And third, the court applied a faulty preemption analysis, finding that an abstract idea was preempted if it first starts with HealthTrio's insight, which is not the abstract idea. Here the claims recite patent-eligible subject matter. They pass the Mayo test. Look, no matter how clever a lot of these ideas are, this is just passing information around, isn't it? Your Honor, I don't think it's fair to characterize it as passing information. I'd say that's no. There are those cases that are similar to that where you extract information and store it in a conventional way. And certainly if what HealthTrio was doing here was scanning health records, storing them in a computer, and making that available, that would be completely different. But we have two aspects here that make this different than that, and they are improvements in computer technology. We're starting from the point where there are electronic medical records. This is not computerizing a known business practice either, because we're past that. We're starting with incompatible databases. And so the first aspect, the normalizing of this data, is not just passing the data around. Is the rules engine a generalized direction to the computer to implement the normalization formula? It's not a general instruction to do that. It's a piece of software that does that, that implements that, the normalizing. And what normalizing is, as the district court said, it's a series of discrete steps that are required. And when they are executed, you end up with a new data format. What that does is it recognizes what the data is, makes sure it's in the right field, creates a new predefined format, and then in addition to that, creates additional relationships between the data. So that's why it's different than, say, translating or transliteration programs, which simply would take the same column in one database program, make that column in another database program that uses different software or a different computer. How does the rules engine do what you described, normalization? Normalization? Yeah, how does it do it? Well, first of all, it recognizes what the data is. So, for example, as described in the specification and elsewhere, in this payor claims data, there might be 130 different ways to describe hypertension, and it recognizes what those are by the codes and then assigns a universal healthcare concept code to that. So, for example, if you look at, I think it's on page 9 of our brief, and also in the appendix, of what that payor claims data looks like, it doesn't look like anything a human can read. It's not like a paper record. And so it has to recognize those codes, which have to be programmed into the rules engine that says, you see this in the payor claims data, this is what it means, and this is where it goes. And that's basically what the rules engine does. It's a piece of software that can do that. And that's not translating or transliterating. How is that an improvement in the operation of the computer? Well, what you get out of that is a normalized record, and it's remodeled to the extent necessary. I've spent a very long time since I wrote programs, but I should think I could write a program that says, if this, then this. Well, those are the basic tools of programming. That's true. And if you break it down to that level, then I suppose no software is patentable. But there's more to it than that. It's what is actually the function that is performed, and what does this normalizing enable someone to do? Well, by creating these relationships between the data, for example, somebody can query that data in a way that wasn't possible before and find out, as the example is given, is this particular procedure covered? Is there anything structurally different in a computer that's used here? Inside the computer? Well, the data structure, the format of the data, the structure of the data through remodeling. It's all ideas transformed into software which move information around. Well, Your Honor, I don't think that's correct, that it's just moving information around. It's creating new relationships between that information that allows it to be used in a different way. Isn't it almost mental steps? Mental steps could not be better. It's a very high-powered moment. It's not possible. We're dealing with it. The old data. Yes. How'd that get into the system? Like the typical electronic? Blood pressure data, yeah, those 110 different versions. Right. How'd that come into the system? Well, the one thing we're not looking at, at least for the personal health care records data, is the health care provider's records. That's specifically in the claims. You don't go to the hospital. You don't go to the doctor. You don't use that. You use the insurance company's claims data. And that's entered into the computer by someone who has filed the claim. A human being. Yes. I think most data gets into the computers by human beings. That's true. It has to be entered at some point. But once it's in there, it's in a form that is incompatible databases. And by normalizing it, it enables it to be used in a new way. So a human being says, high blood pressure claim for, oh, that's a code 99, and enters it. And that data's in there. And somebody else for MetLife says, high blood pressure code for MetLife, oh, that's a 103, and enters it. Right. And your machine looks at all that and knows that a 99 and a 103 are high blood pressure and spits it all out as high blood pressure. It normalizes it that way and assigns a universal code to it as a way of creating a new structure. A human being with a list can't do that? Not with this payor claims data, no. No. I know you want to keep saying normalizing, but to me it sounds an awful lot like just translating data all into the same format. But I don't know that that necessarily sinks your claim. My problem is when I look at this and look at the claims, I don't see anything that actually describes what you think the invention is in detail enough to show that it's actually not just doing regular translation that you would normally do on any kind of computer. I mean this happens all the time in all kinds of disparate databases where people write software to say we're bringing data from one thing that has one format, another thing with another format, and just do it on a computer seems to me not significant. So can you point to me anywhere in the claims that describes it in more detail? I can answer that two ways. Pointing it to what's in the claims, it's the word normalizing and the court's claim construction. The court construed normalizing and also the term remodel to mean something very specific. A lot of times in these cases we don't have a claim construction yet. We do here, and so that term, those words mean something, and the court gave it a very specific definition. A specific process set forth as a series of discrete steps. Data in one or more original formats from various sources is analyzed and converted to a new format. Analyzed being important there because simply the conversion is not enough. Also, second part of my answer, I'd point you to what Edna said normalizing is not. He said it is not converting data as it is transferred from one database to another. They said that. It requires something more, and we agree with that. We agree with the court's claim construction. What is the something more? They said new database, but I'm not sure what that new database is, other than a database that is stated in a way that takes all this disparate data and makes it compatible with each other. It's more than just compatibility. First of all, by normalizing you have a predefined format, and you're making sure that things are in the right spot. Compatibility, as I said, could be just taking the data from one column and one software program and putting it in another column, but you wouldn't know what that data is. So you have to know what it is and make sure it's in the right place. Second, as a result of that, new relationships are created between the data. For example, the idea of when I said is this procedure covered, you might have to look at five different databases to say is this person enrolled, is this a provider that you can go to, is this procedure covered, what's the claims history on this. By normalizing it and creating these relationships, you have something new. So you've got a new database. I get it. But to me, I don't understand. And let me just – I'm not going to hide the ball here. What I'm trying to figure out is whether this is close enough to NFISH or not. And NFISH I think was a very unique case where you had a means plus function claim with a specific algorithm in the specification that said here's a new database. I don't find that here. Okay. The type of new database that is created is not the same as an NFISH. I will grant you that. There is a different aspect to it, and the two aspects are you have created a new structure that didn't exist before in the original data. It may not be self-referential, for example, as it was in NFISH. But is there – I don't mean to interrupt, but this is what I'm concerned about. Is there anything in the claims or the specification that describes what you're saying as a new database in sufficient manner to show me an actual mention? The closest I got in the claims was Rules Engine. Yes. But I don't get any further definition of Rules Engine in the way I would like to see it. Okay. Well, the Rules Engine is the means by which this is accomplished. As I said, it's a piece of software that does that. But I think it comes back to the court's claim construction on what normalizing is and normalizing having a very specific meaning that was argued at the district court. Okay. If that's your answer, that's not – frankly, that's not doing it for me. So is there anything else in the specification that you would point me to on what a Rules Engine is or any other thing that would show that this is a new type of database as opposed to just using some other kind of pre-existing conventional database structures out there and writing new software for translation? Because if you're just modifying information into conventional database structures, it doesn't get it for me. If you've actually created a new type of database and you've claimed that, it seems to me close to ENFISH. That would be close to ENFISH. The database itself is not like ENFISH. It doesn't have that signature difference. But what you do have are new data structures that did not exist before. I think this case – Do we know what kind of database this is? I mean, does the claims or the specification say anything about this database? Like what platform it runs on or anything like that? I don't believe that's in the specification. And for purposes of this, it could be a generic computer component. That's true. But if we wanted to compare it to a case, then I'd say probably the Amdocs case is closer. And in that particular case, there were generic computer components that were used, and there was a step, a limitation in there of enhancing the record when it did correlation between these two pieces of accounting data and enhanced the record. And that's very much like normalizing. We're into your rebuttal time. I assume you'd like to save it. Yes, thank you, Your Honor. We will do that. Mr. Peterson. Good morning. May it please the Court. The district court in this case committed no error in holding that the claims of the patents in suit are ineligible under 101. The judgment should be affirmed. The focus of the claims, their character as a whole, what they're directed to, is merely the manipulation of information, reciting operations such as receiving data, extracting data, classifying the data, changing the format of the data, altering the structure of the data, creating records, supplementing records, and categorizing the record entries. Pretty clever, isn't it? It didn't strike me as being especially clever. Not inventive? Not even close, in my view, Your Honor. As noted in the electric power group decision, the court treats claims like these, drawn to the collection and analysis of information, as being within the realm of abstract ideas, essentially mental processes. That the information is of a specified content, here payor claims data in an unformatted form, doesn't change its character as information. Nor does the recitation of computer components in the claims bring them outside the realm of abstract ideas under step one of the Mayo framework. It's evident from the claims that the server, the rules engine, the database, they are merely invoked as tools to carry out the idea. There's nothing in the claims that can be said to improve the performance of a computer or the function of a computer in any way. The claims are directed to improve record keeping. That's it. What does it take to improve the function of a computer? Could software do it? Or does it require some electronic hardware change to the computer? That's a hypothetical question, Your Honor. I don't know that it... We ask hypotheticals all the time. That's fine. Let me say that I would say that software could improve the function of the computer. And the Enfish case, I think, is an example of that. In a way, the logical structure of software is structure. And that was expressed in the court's cases. And personally, I think I agree with that. So I wouldn't say that it requires necessarily a hardware change to be an improvement in a function of the performance of a computer, if that answers the question. It still leaves open the dividing line between software that improves the function of the computer and software that just handles data. Yes, I think it does leave that open, Your Honor. I think it does. Case by case? I think so. This case, I believe, is distinct from Enfish for that very reason, that Enfish involved the improvement of the performance of a computer. This case is not. This case troubles me. Because it does seem to me – I mean, set aside the information from the claims patent, I don't think they're as difficult. The normalization patents, and particularly the rules engine part of this, seems to me like they are trying to suggest that they've come up with a new structure. And the fault may be that they haven't described it sufficiently, but wouldn't a new way of translating data that had never been done before and took all this disparate data in different forms and created a new type of database be patent eligible? I think it could, Your Honor. And the specification in this case is aspirational in that regard. It wishes that it could come up with a system or could describe a system that could determine the meaning of data without looking at the – I mean, here's my problem with this point, and I don't really know what to do with it. At some point, we get to an issue where if you describe what it's going to do sufficiently, if you describe rules engine and here's what the rules are going to accomplish, they're going to take all this disparate data, then doesn't it become something that a programmer with ordinary skill could accomplish? I mean, we don't have to get to the point and require an actual code in the specification, do we, to find it patent eligible? And so I really struggle with it in these software cases. There's a line where you describe the concepts in sufficient detail that would enable a skilled computer programmer to just do it, and that should be enough, shouldn't it? I agree with you. If you said, for example, make it go here, and when it goes here, make this happen, and so on, you could describe a software program that a programmer could write, and software programmers do that all the time. They draw maps before they write the code, and the map would be sufficient. And if it's describing a technological solution, that would be patent eligible in my view. That's not here. These patents do not describe any technological solution. It's an aspirational suggestion that the computer, the rules engine, determines the meaning of data magically from its context. There's no disclosure about how to do that. I have a background in electrical engineering and computer science. I have no idea what it's talking about, how it would determine the meaning just from numbers. 98.6, is that my temperature or is that my body weight? How would the computer figure that out? And while that's described as the goal or the objective or the purpose of the normalization in these patent specifications, there's nothing described about how that's accomplished technologically. And so let me specifically address the points raised by counsel as to where the inventive concepts allegedly lie. And focus was made, emphasis was made on the court's claim construction of normalization. If you look at the court's actual construction of the term normalization, it is essentially, as was observed, changing the format of the data. It has nothing to do, does not include the notion of determining meaning. It does not include the notion of creating relationships. These are all pulled out of the specification, and there's no recitation in the claims of those concepts. So I would suggest that because of that, those concepts should not play a role in the court's analysis of this issue. As was done essentially in the fair warning case, where the court found the claims to be ineligible, dismissing alleged functions and improvements that were not recited in the claims. That's the case here. For the PHR claims, let me just briefly address them. The emphasis in the reply brief was that the inventive concept for the PHR claims was the very idea of extracting health information from payer-of-claims data. That was the inventive concept, the source of the data. But as the court held in the electric power grid case, merely selecting information by content or source does nothing to differentiate a process from ordinary mental processes, and it's insufficient to rise to the level of an inventive concept. I'm sorry, I was looking down. Were you citing fair warning there? I was. Yes, Your Honor. I guess I would like to briefly address the representative claim issue, although counsel did not raise it in his argument. The health trio faults the district court's use of representative claims in its analysis, yet all health trio does is make the obvious point that the different claims have different limitations. There's no argument, any developed argument that I saw in any of the briefings, that the different limitations made any difference to the analysis of the 101 issue. In Aetna's view, the differences don't matter. The limitations, other limitations of all the other claims are just as functional, just as result-focused, just as descriptive of mental steps and mental processes or human activity and equally devoid of any technological solution as the limitations are in the representative claims. In the Affinity Labs versus Amazon case, the court, even without the consent of the patent owner, treated one claim as representative because no showing was made of how the other claims differed materially. And no substantive argument was made as to the separate patentability of the other claims. And the same is true here. And as a result, Aetna submits that representative claim treatment is appropriate for the same reasons. That's all I have. If there are no other questions, I will surrender the balance of my time. Thank you, Mr. Peterson. Mr. Jakes has a couple of minutes to rebut. Thank you, Your Honor. The question of whether the rules engine is adequately described, it spills over into enablement, and that's not before the court. There is a description of what the rules engine is and what it does. In the 710 patent, column 5, it describes the rules engine and it says it defines the normalized data, how it relates to each other, pursuant to predetermined instructions, and then you refer to the drawings. The actual instructions could vary. And so that's really a question of could a programmer, given this guidance as to what the rules engine has to do, come up with a software program? That's a different question, and that was raised by Aetna in their brief, and it's really a 112 enablement question. Given that we have this construction of what normalizing is, it takes it out of the realm of an abstract idea. I heard some discussion as well of the inventive concept in this case. The court really did not apply Mayo right. I don't see there's any way around that by saying I'm going to exclude the inventive concept from the abstract idea and then not consider it in the second step of Mayo. It has to be one or the other, and there is something in the claims, and to say I'm going to ignore it completely is a significant failing of the district court. I think my problem is analogous to Judge Hughes. Your maps, your figures, just don't drill down to sufficient detail. Your Honor, I believe that's a question of enablement and whether a programmer would be able to implement a rules engine given from the description, which is not the same thing as is it adequately claimed. Thank you, Mr. Jakes. We'll take the case under advisement.